UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

S.F. and R.F. individually and on behalf of
J.F., a minor

      Plaintiffs,

vs.                                               CASE NO:

NOVA SOUTHEASTERN UNIVERSITY, INC.
d/b/a NSU UNIVERSITY SCHOOL,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiffs, S.F., and R.F., by and through the undersigned counsel, and in accordance with the applicable Florida Rules of Civil Procedure, and hereby sues the defendant, NOVA SOUTHEASTERN UNIVERSITY, INC. d/b/a NSU UNIVERSITY SCHOOL, alleges as follows:

## PARTIES

1. The Plaintiff, S.F., is an individual *sur juris* who resides in Broward County, Florida, and the father of J.F.

2. The Plaintiff, R.F., is an individual *sur juris* who resides in Broward County, Florida, and the mother of J.F.

3. The Plaintiff, J.F., is a nine (9) year old child, who resides in Broward County, Florida, and was a student of the NSU University School between January 7, 2019 – November 4, 2019 and is otherwise *sur juris*.

4. The Defendant, NOVA SOUTHEASTERN UNIVERSITY, INC. d/b/a NSU UNIVERSITY SCHOOL (hereinafter "NSU") is a not for profit corporation in the State of Florida and owns and operates a private school known as the NSU University School (hereinafter

"U School") which is located on the NSU campus at 3375 SW 75 Avenue, Ft. Lauderdale, Florida 33314. NSU and the U School are recipients of federal funding.

## JURISDICTION AND VENUE

5.      Jurisdiction for this action vests pursuant to 42 U.S.C. § 12131 for claims brought under the Americans with Disabilities Act of 1990; 29 U.S.C. § 794, for claims brought under Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C. §§ 1983 & 1988 for violations of S.F., R.F. and J.F.'s civil rights; and the District Court's pendent jurisdiction over the state claims alleged, which arise out of the same operative facts and circumstances.

6.      Venue for this action lies pursuant to 28 U.S.C. § 1391(b) in that the Defendant is located in the judicial district and the cause of action accrued in the judicial district.

## GENERAL ALLEGATIONS

7.      This action arises out of the negligent and discriminatory actions at the U School.

8.      This is also a breach of contract action.

9.      U School serves students from Kindergarten through 12th grade.

10.     U School purports to provide a personalized approach to education, providing each student with an individualized instructional approach to ensure that each student can access the curriculum.

11.     The students also have access to college level resources because of the school's location on NSU's campus and the school's relationship with NSU.

12.     U School further advertises that it offers students "learning by doing" which provides students with hands on activities that enrich their academic life and help them "grow into confident leaders and critical thinkers."

13.     U School is accredited by the Southern Association of College and Schools, Florida Council of Independent Schools, and the Florida Kindergarten Council.  U School is also a member of the National Association of Independent Schools, the Educational Records Bureau, the College Entrance Examination Board, the National Association for College Admission Counseling and the National Association of Laboratory Schools.

14.     The Plaintiffs were relocating to Broward County, Florida mid-2018-2019 school year.

15.     The Plaintiffs invested a significant amount of time and resources into finding an appropriate school for J.F. in Florida.

16.     J.F. is extremely bright, academically gifted, sweet natured, eager to please and very interested in learning.  He is also a child with severe deficits in recognizing social and emotional cues; perseveration and rigidity; along with emotional dysregulation all of which sometimes manifested themselves in oppositional type behaviors and sensory overloading.

17.     The Plaintiffs had several long discussions with U School about J.F., the manifestations of his disabilities, and his daily needs.  They also discussed the private providers working with the family and the types of medications and therapies that were being utilized to address J.F.'s needs. The U School indicated that they were ready, willing and able to accept J.F. and address all his needs, including his unpredictable behaviors. U School also agreed to work cooperatively with the Plaintiffs to ensure that J.F. would be successful.

18.     On October 11, 2018, U School accepted J.F. into their program for the remainder of the 2018-2019 school year.

19.     An Enrollment Contract was entered into by the parties.

20.     J.F. began school at U School on January 7, 2019.

21.    J.F. entered the 2nd grade.

22.    Overall, for the remainder of the 2018-2019 school year, J.F. did very well.

23.    There were, however, some instances of adjustment and frustration.

24.    J.F. was also bullied by other students; one student consistently and repeatedly.

25.    In response to the challenges, Plaintiffs requested permission to bring in private behavior support, referred by Plaintiff's private neuropsychologist, at Plaintiff's own expense to address these issues via intervention and facilitation.   U School refused, allowing only observation by the private providers.

26.    At the end of the school year, and after a significant financial donation to the school, U School agreed to a meeting with R.F., the private neuropsychologist and the private behaviorist who all provided specific guidance to the second grade faculty, administrators and guidance counselors regarding how to better support J.F. U School reconfirmed that they were ready, willing and able to address J.F.'s needs and work cooperatively with the family to ensure J.F. was successful.

27.    U School further agreed to reconvene a similar meeting but with the third-grade teachers to ensure J.F. would be successful for 2019-2020 school year.

28.    For the most part, the remainder of the 2018-2019 school year was successful, and the family was eager to return for the 2019-2020 school year.  J.F. was promoted to the third grade and U School seemed eager to have J.F. return to school.

29.    A second enrollment contract was entered into for the 2019-2020 school year.

30.    Over the summer of 2019, J.F. received significant additional medical diagnoses including Lyme disease and pediatric autoimmune neuropsychiatric disorders (PANDAS) associated with streptococcus. PANDAS syndrome involves sudden and often major changes in

personality, behavior, and movement in children following an infection involving *Streptococcus pyogenes*.

31.     Shortly after the diagnosis, at a meeting with U School, R.F disclosed this new information to U School.

32.     J.F.'s private neuropsychologist and private behaviorist, also present again at a meeting with U School, explained what was expected related to changes in medication and possible side effects. The family sought to continue the partnership with U School to work with J.F. as adjustments to medications were made and therapies were introduced. U School again stated that they were ready, willing and able to address J.F.'s needs even with this new information.

33.     Increases in unwanted behaviors were expected and discussed at length with U School. Specifically, the private neuropsychologist, private behaviorist and R.F. offered additional guidance as to effective protocols, already being used consistently at home, to address any unwanted behaviors and to help J.F. be successful.

34.     With the promise of future donations, U School agreed finally to allow the private behaviorist to be present at the U School on a limited basis - during lunch and recess - to help facilitate successful behaviors and to intervene, when necessary, to address any unwanted behaviors that were observed.

35.     Occupational Therapy needs were also discussed. Ultimately, U School stated that they had their own Occupational therapist (OT), an employee of NSU, who was ready, willing and able to address J.F.'s needs and provide him the necessary supports. U School refused to allow the private OT (referred by the private neuropsychologist and the private behaviorist) to provide services to J.F. at U School.  However, since the private OT had evaluated already J.F

and identified J.F.'s most pressing needs, the private OT shared the evaluation with the NSU OT so that she would have the most up to date information and be best able to provide the necessary supports for J.F.

36.     Simultaneous to this meeting, the family was approached again about donating money to U School, this time by U School's Head of School, William Kopas (hereinafter "Dr. Kopas"). When R.F. suggested that any gift given should be unrestricted and asked how best their donation might be employed, Dr. Kopas indicated their donation would go towards professional development programs for teachers to "help children like J.F."

37.     Accordingly, R.F. and S.F. not only donated significant money again but promised also to make a similar donation every year that J.F. was in lower school and to increase the gift when J.F. entered middle school.  In fact, Dr. Kopas asked Plaintiffs to memorialize the pledge by contract with which request Plaintiffs complied.

38.     The family was cautiously optimistic and began the 2019-2020 school hopeful.

39.     As expected, when J.F.'s medications were changed, J.F. showed signs of struggling.

40.     In September, J.F. was sent to the office regularly for "problem" behaviors. Rather than address his needs in the classroom, using the guidance given by the private neuropsychologist and private behaviorist, the teachers would send J.F. to the office. Removing J.F. from the classroom not only resulted in J.F. missing direct instruction from his teachers but also was punishing J.F. for behaviors which were a clear and anticipated manifestation of his disability. Being removed from the classroom, as a disciplinary removal, was embarrassing for J.F. and impacted his self-esteem and self-image.

41.     Rather than address his needs, U School separated and isolated J.F. repeatedly and regularly.

42.     Once in the office, appropriate interventions were not utilized. A few times, the administration did contact the private behaviorist (at the expense of the parents), but the staff in the office did not implement appropriate behavior interventions, and instead escalated and reinforced the unwanted behaviors.  For example, Dr. De La Fuente, the lower school Vice Principal, told J.F. that if he did not "calm down", she would take pictures/videos of him and send them to his parents.  Which she, in turn, did.  Dr. De La Fuente took pictures of J.F. during a meltdown and sent them to the family.  This was neither a therapeutic response nor was it an appropriate behavioral intervention. This was humiliating for J.F.

43.     By being removed to the office for manifestations of his disability J.F. learned quickly that when he was frustrated or uncomfortable, he could "misbehave" and he would be sent to the office, thereby allowing him to escape the uncomfortable situation. This reward of escape only reinforced the unwanted behaviors.

44.     In late September, an episode occurred at lunch in the presence of his private behaviorist. J.F. started to get upset because he was embarrassed. His private behaviorist removed him swiftly and subtly to the nurse's office (across from the cafeteria) so that she could support him while he calmed down. While with the nurse, outside the view of any students or teachers, J.F. was placed in a therapeutic safe hold. Immediately thereafter, not yet able to calm down, J.F. locked himself in a bathroom and attempted to flush a school walkie talkie in the toilet.

45.     Once the appropriate behavior interventions were implemented, J.F. was able to calm down and return to class and finish out the rest of the day without further incident. The Plaintiffs paid for the replacement cost of the walkie talkie.

46.     The family continued to attempt to work with the school and requested again for their private OT to be allowed to come into school and work directly with J.F. on self-regulation. U School continued to refuse, insisting that its on-site NSU OT was equipped to address all of J.F.'s needs.

47.     Despite all the efforts by the parents and the private professionals employed by the family to assist U School, J.F. continued to be removed from the class and be isolated in the office.

48.     It was also discovered that he was being bullied daily by the same student who had bullied him the year before. Complaints about this bullying were made to the administration at U School.

49.     U School became increasingly less communicative with the family.

50.     One significant incident occurred when the two guidance counselors, who were present during the training meetings with U School faculty and administrators, R.F., the private neuropsychologist and private behaviorist, pulled J.F. into their office and confronted him, without his parents present, regarding an allegation made by an elective teacher of J.F., who had not been briefed by U School administrators, guidance counselors and faculty of J.F's disabilities or the extensive private supports shared with U School by Plaintiffs.

51.     Like many children with behavioral issues, J.F. complained to this elective teacher about his behaviorist. Rather than utilize the protocols set up to address such issues/complaints, including contacting the parents, these counselors circumvented the

communication chain established with the family and the school team working with J.F. When an inquiry was made about why the protocols were abandoned, the family was told that the complaint needed to be investigated and reported to the Department of Children and Families, if necessary. The parents felt threatened and intimidated.

52.     Another incident involved a morning room teacher, also not briefed by U School administrators, guidance counselors and faculty of J.F's disabilities or the extensive private supports shared with U School by Plaintiffs. This teacher was responsible for watching J.F. on an almost daily basis before the regular school day began. Yet, this teacher was not made aware of J.F.'s needs or manifestations of his disabilities. As a result, the teacher caused J.F. to have a completely avoidable melt down.  J.F. absconded and was later found hiding in a bathroom. Why the teacher was not informed of his needs was never explained.

53.     After several of these types of incidents occurred, another meeting was scheduled at the behest of the Plaintiffs, the private neuropsychologist and the private behaviorist for October 10, 2019 so that a wider circle of the U School community could be informed of J.F.'s needs and medical challenges.

54.     Again, at their own expense, the family's private therapeutic team created consumable forms that contained information about J.F. and his needs entitled, "J. F.'s Guide to Success".  These guides were to be given out to anyone who would be working with J.F. moving forward.

55.     Around this same time, J.F. also began reporting that he was being bullied. Every day during recess, the bulling student initiated a special game of tag (for which she had a "secret" name referencing J.F.) where the other students would not be allowed to play if they were friends with J.F or tried to include J.F.. Or, the bully directed the other students to only tag

J.F. even though he was not "allowed" to play. The bullying was observed and reported by more than one of J.F.'s private behaviorists on several different occasions. Reports were also made by J.F. and his parents. U School did nothing to stop the bullying and allowed the games to continue during recess.

56.     This was particularly heartbreaking for J.F. since U School faculty told him repeatedly that if he calmly used his words to express his hurt or frustration about a situation, then they would help and protect him.  They never did.  Instead, U School's Head of Lower School, Donna Tobey, and U School's guidance counselor told R.F. specifically that the bully merely had been instructed on "how to be nice to people you don't like."

57.     In this heightened context of J.F. cycling through different medications, being bullied and left unprotected, another incident occurred at the end of October 2019. NSU's OT embarrassed J.F. in front of the bully on the way to his occupational therapy session. This is the same NSU OT who indicated that she would be able to handle any of J.F.'s needs, especially helping him with self -regulation. Rather than use appropriate behavior interventions, and help him with self-regulation, the OT instead escalated J.F.'s behavior. Specifically, she dismissed his feelings and called for Dr. De La Fuente, in her capacity as disciplinarian. Once again, Dr. De La Fuente failed to use appropriate interventions and instead escalated J.F. who responded verbally and inappropriately attempted to destroy property.

58.     As U School was well aware, J.F. has significant processing deficits that make it impossible for him to express himself appropriately when he is upset and frustrated.

59.     The NSU OT was the "expert" tasked with helping J.F. express himself appropriately and learn coping and self-regulation skills.

60.     Despite the parents' disappointment with how U School handled the incident, the parents insisted that J.F. be held accountable and asked that J.F. be given the same consequence as a student without disabilities – which turned out to be a suspension. The suspension resulted in J.F. missing the very exciting Halloween events at school on October 31, 2019 to which J.F. was looking forward to attending. U School acknowledged that missing these events was a significant consequence and punishment for J.F.

61.     J.F's first day back to school after his suspension, November 4, 2019, was also his last day at school.

62.     J.F. was again sent to Dr. De La Fuente's office, for discipline, toward the end of the school day because an assistant teacher, not following the "guide to success", embarrassed J.F. in front of his entire class when he got frustrated by his inability to solve a math problem. J.F. responded verbally inappropriately. It was made very clear that publicly shaming J.F. would cause an escalation as opposed to following the protocol of pulling him aside and quietly reminding him of the "rules" or "what he was working for".

63.     Once in Dr. De La Fuente's office, rather than use appropriate behavior interventions, the staff escalated J.F.  R.F. was called to the school and when she arrived, she witnessed J.F. in a full melt down surrounded by very angry faculty and staff including, Dr. Kopas, Donna Tobey and the school's security officer. J.F. was clearly in pain, he was scared and distraught. The tone in the office was one of obvious disgust and disdain for this then 8-year-old child. R.F. was quickly able to calm J.F. down and remove him from the office.

64.     It was clear that U School did not want J.F. to remain in the school.

65.     However, in an effort to work with the school, R.F. offered to keep J.F. home until his medications were stabilized and J.F.'s doctors had cleared J.F to return to school to U

School's satisfaction. The parents also requested that J.F.'s classwork be sent home, but U School refused.

66.     Instead, without any due process, U School expelled J.F. from the school.  It became clear that there was nothing the family could say to change the school's position.  U School had a predetermined plan to remove this student.

67.     U School then began to justify its actions, after the fact, by fabricating records claiming that J.F. was "dangerous" and violated the student handbook.

68.     Rather than address his needs in an appropriate manner, U School labeled J.F. dangerous and told him that he could not return to school.

69.     The label was not only callous and calculating, it is patently false.

70.     Despite being saddled with disabilities (about which U School had full knowledge), including infections which inflamed his brain to the point that his doctors described his brain and body as being "on fire"; despite being bullied by other students and unprotected by U School, despite being triggered continually by U School instead of supported therapeutically; despite U School failing to offer supports to J.F. on their own volition and then failing to follow the guidance offered to them by J.F.'s expert private providers at Plaintiffs' own expense; despite being shamed and punished for manifestations of  his disabilities,– J.F never harmed any U School or NSU student, administrator, faculty member or otherwise employee,. Moreover, J.F. never had a significant outburst in front of another U School or NSU student. J.F. was never dangerous.

71.     This labeling as "dangerous" is contradicted by U School's own documentation that states J.F. is sweet, kind and eager to please and is also contradicted by the verbal statements

of U School employees. The label also fails to acknowledge how hard J.F. was working to get through the school day and not engage in "unwanted" behaviors.

72.     This labeling will have long term and irreversible impacts for J.F.'s entire academic career.

73.     The parents, through counsel, requested a copy of J.F.'s educational file to ensure no disparaging or otherwise discriminatory information was contained in the file. To date, U School has refused.

74.     The failures of U School and its staff constitute deliberate indifference and discrimination.

75.     J.F. has been traumatized by his experiences at U School, the long-term impacts of which are not yet known. He has suffered humiliation and embarrassment.  He feels stigmatized, different, isolated and punished.

76.     Not only has U School refused to provide J.F with any academic instruction since November 2019 but U School also has held the defamatory and fabricated records of J.F. hostage such that J.F has not been able to apply to another private school.

77.     As a result of U School's refusal to give J.F. the fresh start to which he is entitled, J.F. is being home schooled, at great expense to Plaintiffs.

78.     U School receives federal funds for which it contracts to not discriminate.

79.     On December 20, 2019, the parents asked NSU to investigate the discriminatory and retaliatory actions taken by U School.  This request was simply ignored or denied.  No response was ever received.

80.     J.F.'s exclusion from U School caused emotional and psychological damages to J.F.

81.     J.F. has not received any academic instruction or support from the U School since his removal on November 4, 2019.

82.     The U School failed to provide the requisite level of support, training and interventions to ensure J.F. would be safe while on school campus.

83.     The staff's gross negligence, indifferent and reckless conduct, along with the failure of U School to properly address J.F.'s needs was a breach of contract and has caused J.F. to experience severe psychological injuries, including but not limited to the humiliation, embarrassment, isolation, loss of faith, increased problem behaviors and feelings of low self-worth, low self-esteem, anxiety, and the loss of capacity for the enjoyment of life.  These injuries suffered were severe and continuing.

84.     U School had a duty to operate said school with reasonable care and for the protection and safety of those students who were actively attending said institution.

85.     U School further breached its duty under a contract to educate J.F. free from discrimination and retaliation.

86.     Plaintiff, J.F., by and through his parents, and S.F. and R.F. have engaged Disability Independence Group, Inc. to represent them in this action and who are obligated to pay reasonable fees for their services and costs related thereto.

<u>**COUNT I**</u>
<u>**VIOLATION OF TITLE III OF THE AMERICAN DISABILITIES ACT**</u>

87.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

88.     J.F. is a person with a disability as defined by the Americans with Disabilities Act (ADA) as he has a physical or mental impairment that substantially limits one or more major life

activity. 42 U.S.C. §§ 12131–12165.

89.     The Defendant is a place of public accommodation and therefore subject to Title III of the ADA.

90.     The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1)&(2).

91.     The ADA requires that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.." 42 U.S.C. § 12182.

92.     Excluding children from U School because of a disability and not accommodation the student while in school is exactly the type of discrimination and segregation the ADA and its amendments aim to prevent and specifically prohibit.

93.     U School discriminated against J.F. in violation of the ADA on the basis of his disabilities by failing accommodate him, provide the requisite supports and services to keep him safe at school, and then expelling him.

94.     The actions and omissions of the District were done with deliberate indifference to the rights of J.F. and his parents, and as such, the Plaintiffs are entitled to damages for their injuries as a result of these discriminatory actions and removal.

**WHEREFORE**, S.F., R.F., individually and on behalf of J.F., respectfully request this Court to declare the actions of the Defendant violated the Americans with Disabilities Act, issue a permanent injunction enjoining the Defendant from discriminating against students with disabilities and awarding Plaintiffs' attorneys' fees, costs and expenses incurred in this matter and for such further relief as the court deems just and equitable.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. § 794(a)

95.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

96.     Plaintiffs further allege that J.F. has a disability that substantially limits one or more major life activities and is a person with a disability under Section 504 of the Rehabilitation Act, as amended. See 29 U.S.C. §706(8).

97.     J.F. is otherwise qualified under section 504 of the Rehabilitation Act because he met the essential eligibility requirements of the Defendant at all times material hereto.

98.     Defendant is a recipient of federal financial assistance.

99.     The Defendant's policies, practices and procedures violated the Plaintiffs' rights under Section 504 of the Rehabilitation Act by discriminating against the Plaintiff because of his disability.

100.     Repeatedly disciplining and removing J.F. from his classroom for identified and known problem behaviors, resulted in an escalation of those behaviors, which lead to more removals which ultimately lead to trauma, a dislike for learning, a decrease in self-esteem and self-image and expulsion from U School.

101.     The Defendant has discriminated against J.F. in violation of Section 504 of the Rehabilitation Act on the basis of his disabilities and successfully excluded J.F. from the U School.

102.      As a result of the Defendant's violations, J.F. and his parents continue to be harmed.

103.     The actions of the Defendant and its agents were done with deliberate indifference

to the rights of J.F., and his parents, and as such, the Plaintiffs are entitled to damages for their injuries.

**WHEREFORE**, S.F., R.F., individually and on behalf of J.F., respectfully pray that this Court grant the following relief against the Defendant, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendants actions and inactions have subjected J.F. to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining the Defendant from any practice, policy and/or procedure which would deny students with disabilities equal access to and benefit of the Defendants services, award damages, reasonable costs, attorneys' fees and any other relief this court deems necessary and appropriate.

## COUNT III
## RETALIATION

104.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

105.     Retaliation is prohibited under the ADA. 42 U.S. Code § 12203.

106.     The definition of retaliation is found in the implementing regulations of the Americans with Disabilities Act at 28 CFR 36.206.

107.     Plaintiffs allege that the Defendant's use of threating to contact the Department of Children and Families and fabricating records stating that this student was "dangerous" were done in direct response and in retaliation for the parents' strong efforts to advocate for J.F.

108.     A prima facie case for retaliation consists of four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this

right; 3) the defendant then took an action adverse to the plaintiff; and 4) the protected activity and the adverse action are causally connected.

109.    In this case, advocating for J.F. is a legally protected action. The Defendant was aware of the family's advocacy and in response the Defendant and its agents threated to contact the Department of Children and Families and after they had made the decision to remove the student from their school, fabricated information stating that the child was "dangerous" in an effort to cover up their discriminatory removal of J.F. from the U School.

110.    Plaintiffs have suffered severe emotional distress due to Defendant's retaliatory acts.

**WHEREFORE**, S.F., and R.F., individually and on behalf of J.F., demand judgment against the Defendant for damages, together with their attorney's fees and costs, and such further relief as the court deems just and equitable.

## COUNT IV
## NEGLIGENCE

111.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

112.    At all times material, the U School owed a duty to J.F. to use reasonable care to ensure J.F.'s safety, care, health, and well-being by ensuring that J.F. was free from bullying from other students and having the appropriate supports and services in place to ensure he was safe while at school.

113.    U School also had a duty to hire, retain, assign, supervise and train its faculty and agents who interacted with J.F. while on the school campus.

114.    At all times material, U School was in *loco parentis* and was held to a standard of reasonable protection for the minor disabled child, J.F., who was its student.

115.    At all times material, U School owed a duty to J.F. to investigate and prevent bullying by other students.

116.    At all times material, U School owed a duty to J.F. to investigate and supervise its teachers, agents and employees, especially those staff members working directly with J.F., a disabled student.

117.    At all times material, U School had a duty to ensure that the appropriate interventions, accommodations, services, and supports were in place for J.F.

118.    At all times material, U School had a duty to ensure that the staff working with and having contact with J.F. were trained on his disability and his needs and that the appropriate services, interventions and supports were in place to ensure J.F.'s safety on the school campus.

119.    At all times material, U School breached these duties in one or more of the following ways:

a.  Failing to investigate and protect J.F. from bullying;
b.  Failing to provide a safe environment for J.F. where he would be supervised at all times in a safe and secure manner by teachers, agents and/or employees of the U School;
c.  Failing to provide the necessary training, specifically to the before school teachers, assistant teachers, and occupational therapist, to ensure that J.F. would not be humiliated in front of his peers, allowed to abscond and hide in a bathroom or be escalate by the adults who were to be trained to deescalate J.F.; and
d.  Failing to provide the appropriate services, supports, interventions and/or training for staff interacting with a disabled student.

120.    As a further direct and proximate cause of the negligence of the U School, J.F.

was subjected to gross neglect which caused J.F. to suffer psychological injures and suffering, humiliation, embarrassment, low self-image, low self-esteem, loss of sleep, loss of trust and loss of the capacity for the enjoyment of life.

121.   As a further direct and proximate cause of the negligence of the U School, J.F. has incurred medical and psychological expenses for the treatment of his injuries and will incur such expenses in the future.

**WHEREFORE**, the Plaintiffs, S.F. and R.F., individually and on behalf of J.F., sue defendant U School for damages in excess of $15,000.00 including pre and post judgment interest to the extend allowed by law, plus costs and interest, and demand a trial by jury for all triable issues.

<u>**COUNT V**</u>
<u>**BREACH OF CONTRACT**</u>

122.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

123.   At all times material, U School and S.F. and R.F. had a contract for educational services.

124.   Defendant had a duty to educate J.F. and ensure that the program was accessible to J.F.

125.   Defendant breached the contract by taking monies from Plaintiffs, without providing the full services for which the payments were intended. Defendant further breached the contract by expelling J.F. for the school program and not returning unused tuition as required by the contract.

126.   Defendant's breach caused Plaintiffs to suffer damages.

**WHEREFORE,** the Plaintiffs, S.F. and R.F., individually and on behalf of J.F., sue defendant U School for damages in excess of $15,000.00 including pre and post judgment interest to the extend allowed by law, plus costs and interest, and demand a trial by jury for all triable issues.

<u>**COUNT VI**</u>
<u>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

127.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

128.   Plaintiffs further allege that the Defendant had knowledge of Plaintiff, J.F.'s disability and his needs, however and notwithstanding that knowledge, intentionally deprived Plaintiff of his rights, excessively discipling, removing J.F. from class and isolating him in this office, and then permanently excluding him from the U School program all together.  Then the U School refused to send home any academic work to ensure that J.F. would have continuity in his education and refused to provide copies of J.F.'s education records.

129.   Based upon the Defendant's outrageous acts of discrimination and retaliation, showing both deliberate and reckless acts, the Defendant intentionally inflicted emotional distress unto the Plaintiffs.

130.   As a result of the Defendant's actions and in actions, Plaintiffs have suffered damages.

**WHEREFORE**, S.F. and R.F., individually and on behalf of J.F., demand a judgment against the Defendant for compensatory damages, extreme emotional distress, damages of physical discomfort and inconvenience, mental suffering, humiliation, loss of enjoyment of life,

punitive damages, interest, attorneys' fee and such further relief as this court deem just and equitable.

## **DEMAND FOR JURY TRIAL**

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**.

Dated this 14th day of February, 2020.

By*: /s/ Stephanie Langer*
Stephanie L. Langer, Esq.
Fla. Bar No: 149720
Matthew W. Dietz, Esq.
Fla. Bar No.: 0084905
Disability Independence Group, Inc.
2990 Southwest 35th Avenue
Miami, Florida 33133
Telephone (305) 669-2822
Facsimile (305) 442-4181
slanger@justdigit.org
mdietz@justdigit.org
aa@justdigit.org